### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-127-P-H** |
| | ) | |
| **KARL KNIGHT,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Karl Knight, charged with making a false statement in connection with the attempted acquisition of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), Indictment (Docket No. 1), moves to suppress statements he made during his transport from the Saco, Maine Police Department to the Cumberland County Jail in Portland, Maine, on January 29, 2008. An evidentiary hearing was held before me on August 4, 2008 at which the defendant appeared with counsel. One exhibit was offered by the defendant and admitted over objection. Two witnesses testified for the government. I now recommend that the following findings of fact be adopted, and that the motion be denied.

### I. Proposed Findings of Fact

On January 29, 2008, special agent Stephen E. Hickey, Jr., of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in the Portland, Maine office, contacted the defendant's attorney regarding a warrant for the defendant's arrest. Hickey and the defendant's attorney arranged for the defendant to turn himself in to the nearest police department, which was in Saco. ATF policy requires that a minimum of two agents transport an arrested individual. The resident agent in charge of the Portland ATF office, Dale Armstrong,

1

was the only agent available to accompany Hickey to Saco.  Local police never transport federal prisoners to the ATF office or the Cumberland County Jail when a federal prisoner turns him or herself in at the local police department.  Such individuals are always transported by federal officers.

Armstrong drove Hickey's unmarked 2002 Ford Explorer to the Saco Police Department. Hickey keeps many of his files in this vehicle.  If it was not in the vehicle when Hickey learned that the defendant was turning himself in at the Saco Police Department, he would have retrieved the defendant's file from his office when he went there to meet Armstrong before driving to Saco.  Neither agent was in uniform.  They arrived at the Saco Police Department at around 4:30 p.m.

Hickey told the defendant who he was, removed the handcuffs that the Saco police had put on the defendant, replaced them with his handcuffs, and told the defendant that he would be transporting him to the Cumberland County Jail.  Hickey had spoken with the defendant on the telephone in the past in an attempt to question him about the "4473" form[1] that the defendant had filled out when he had purchased the firearm here at issue.  The defendant had not been cooperative on the telephone.  Hickey had not met the defendant before January 29, 2008.

The defendant was curious and nervous.  He was very polite and congenial but kept asking questions such as: "What can we do to take care of this?"  "What is this all about?"  "Why am I under arrest?"  Hickey told the defendant that he would explain everything once they got to the jail; he wanted to get to the jail as soon as possible due to the late hour.  The defendant was placed in the rear seat of the Explorer on the passenger's side, and Hickey got into the back seat behind the driver, Armstrong.  The defendant continued to ask questions, almost constantly.

---

[1] The "4473" form is the federal form on which the defendant is alleged to have made a false statement in connection with an attempt to acquire a firearm.

Once the car was underway, Hickey told the defendant that he could not talk to him because Hickey had already been in touch with the defendant's attorney.   The defendant nonetheless continued to ask questions.   Hickey told the defendant that he would have to advise him of his rights, if he kept talking.   The defendant did not stop talking.   Hickey, therefore, read him his rights from the *Miranda* card[2] that he always carries, pausing after reading each statement to ask whether the defendant understood.   Each time, the defendant indicated that he did understand.   Hickey then asked the defendant whether he wanted to waive his rights and talk to Hickey or to invoke his rights and remain silent.   The defendant said that he did not want to talk to Hickey.

However, after no more than 30 seconds, the defendant began asking questions again.   He wanted to know how he had violated federal law, what would happen to him, how he could "take care of this," and similar queries.   Hickey told the defendant that he had just informed him of his rights, and that he could only answer his questions if the defendant waived his right to have his attorney present.   The defendant then waived his rights and asked Hickey to answer his questions.   Hickey showed the defendant the "4473" form on which he is alleged to have made the false statement at issue and a copy of the protection order that was in force against the defendant at the time that the form was signed.   He told the defendant that his arrest was based on this paperwork.

The defendant asked Hickey why they were not previously able to deal with this issue "as gentlemen on the phone."   Hickey reminded the defendant that, when he had called the defendant to discuss the matter, the defendant had said "That's up to you and the government to deal with." The defendant responded that, at the time, he had "things going on then" and that he "was in a bad place." During that telephone conversation, the defendant had kept repeating that "they"

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

could not take his guns away.  The only question Hickey asked the defendant during the transport was why he had not returned Hickey's telephone calls.  The transport took about half an hour.

The defendant said that he had attempted to buy a firearm.  The response to Question 12(h) on the "4473" form indicates that the defendant was not subject to a protection order, but court records show that a protection order was in effect against him at the time.  Hickey then said that "we have to assume that the person who filled out this form lied."  The defendant said that he had filled out the form. The defendant explained that he had a "note" from the state-court judge that said that, even though a protection order had issued, the defendant could possess guns for hunting and that the "note" was in the possession of his former attorney.  This "note," he said, led him to believe that the protection order did not matter at the time that he was filling out the form to obtain guns for hunting.

Upon arrival at the jail, Hickey asked the defendant how he felt about their conversation in the car and whether he felt that his rights had been violated in any way.  The defendant replied that he appreciated how Hickey had treated him and asked if Hickey would be at the defendant's initial appearance the next day and would speak on his behalf.  Hickey told the defendant that he would be at the hearing but could not speak for the defendant.

On cross-examination, Hickey testified that he had seen Defendant's Exhibit 1[3] at some time subsequent to the defendant's arrest, and that he believes it is the "note" described by the defendant, allowing him to obtain hunting guns during the pendency of the protection order.

Dale Armstrong testified that he drove Hickey's car for the defendant's transport and heard Hickey read the defendant his *Miranda* rights.

---

[3] Defendant's Exhibit 1 is an order dated September 16, 2004 from the Maine Tenth District Court in the matter of *Kerry Vermette v. Karl Knight*, Docket No. SPRDC-PA-04-116, ordering that "the Defendant shall be entitled to possess firearms and obtain a hunting license during the pendency of a Consent Order issued in this case."

## II. Discussion

The government conceded at oral argument that the defendant was in custody at all relevant times on January 29, 2008.  Accordingly, the only questions are whether the defendant was interrogated during the transport and, if so, whether he knowingly and voluntarily waived his constitutional rights.  Counsel for the defendant argued at the close of the evidence that the court should "infer" that Hickey's actions during the transport were "tantamount to questioning" under *Rhode Island v. Innis*, 446 U.S. 291 (1980), in that Hickey knew that what he said to the defendant would elicit an incriminating response and, thus, whatever the defendant said should be suppressed.

*Innis* held that the *Miranda* safeguards come into play whenever law enforcement officers who have an individual in custody should know that their words or actions are reasonably likely to elicit an incriminating response from that individual.  446 U.S. at 301.  Here, however, nothing that Hickey said to the defendant before reading him his *Miranda* rights can reasonably be construed to meet the *Innis* standard.  Hickey showed the defendant the paperwork that formed the basis of the charge against him only after the warnings were read and the defendant explicitly waived his *Miranda* rights.  Thus, the argument of counsel for the defendant that the presentation of the paperwork was designed to elicit an incriminating response provides no reason to suppress the defendant's incriminating statements.

At oral argument on August 4, 2008, counsel for the defendant also argued that the court should not view as a waiver the defendant's response to Hickey's statement to him that Hickey could not answer his questions unless he waived his right to have his attorney present, because 1) the court cannot infer a waiver when there is no evidence that the defendant said, "I've thought better of it and now I'm uninvoking the rights I just invoked," citing *North Carolina v. Butler*,

441 U.S. 369 (1979), and 2) Hickey should have called the defendant's attorney, whose telephone number he had at the time, and allowed the defendant to talk to him before answering any of the defendant's questions.

The holding in *Butler* was not, as counsel for the defendant suggested, that a defendant does not waive his *Miranda* rights merely by talking to law enforcement officers, but rather that an explicit statement of waiver is not necessary to find that a defendant has in fact waived those rights. 441 U.S. at 373. Here, Hickey's unrebutted testimony that the defendant said "yes" when asked "Do you want to waive your rights to be silent and to have an attorney present?" means that the court does not have to infer a waiver. This explicit waiver is sufficient. Contrary to the defendant's argument, it is not necessary that the defendant also add, "I am changing my mind and now I waive my rights," or words to that effect.

Counsel for the defendant cited no authority for his second argument, that Hickey, who happened to have a cell phone with him and happened to know the telephone number of the defendant's attorney, was required to call the defendant's attorney, take off the defendant's handcuffs, and tell the defendant to speak to his attorney before he could answer the defendant's questions, even after the defendant indicated that he waived his rights. I am aware of no such authority and doubt that any court would hold that law enforcement officers have such an obligation, let alone one of constitutional dimension. *See generally Fuentes v. Moran*, 733 F.2d 176, 181 (1st Cir. 1984) (officers not required to inform defendant in custody that his attorney had called to inquire about his status). A knowing and voluntary waiver of the rights is all that is required, and that is what Hickey obtained in this case.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 7th day of August, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

7